**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JENNIFER DI BENEDETTO,<br><br>Plaintiff,<br><br>v.<br><br>THE LOCKWOOD GROUP, LLC, TOURMALET PARENT HOLDINGS LP, MATTHEW SCHECTER, individually, ALAN BANNER, individually, ELISABETH WEST, individually,<br><br>Defendants. | Case No. 2:26-cv-615 (BRM) (LDW)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are Defendants the Lockwood Group LLC ("Lockwood"), Matthew Schecter ("Schecter"), Alan Banner ("Banner"), and Elisabeth West's ("West") (collectively, "Individual Defendants") (all Defendants collectively, "Defendants")[1] Motion to Dismiss the Second Amended Complaint ("Motion"). (ECF No. 21.) Plaintiff Jennifer Di Benedetto ("Di Benedetto") filed a timely opposition on May 22, 2026. (ECF No. 23.) Defendants replied on June 6, 2026. (ECF No. 25.)

Having reviewed and considered the parties' submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78(b), for the reasons set forth below and for good cause appearing, Defendants' Motion

[1] Tourmalet Parent Holdings LP ("Tourmalet") is a named defendant and the parent company of Lockwood. (ECF No. 19 ¶ 10.) Tourmalet allegedly issued Di Benedetto equity as part of her executive incentive package. (*Id.*) This party has yet to have been served with process. (*Id.*)

to Dismiss is **GRANTED IN PART** and **DENIED IN PART**. Counts III, VII, XII, XIII, and XIV of the Second Amended Complaint are **DISMISSED WITHOUT PREJUDICE**.

## I. BACKGROUND

### A. Factual Background

For the purposes of this Opinion the Court accepts all allegation in the Second Amended Complaint as true an interprets them in the light most favorable to Di Benedetto. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). This case arises from the allegedly unlawful termination of Di Benedetto from her position at Lockwood, a healthcare communications company, in 2025. At the time of her termination, Di Benedetto was a senior executive and a C-level executive at Lockwood. (Second Amended Complaint ("SAC") (ECF No. 19) ¶¶ 15–17.) She started working at Lockwood in 2010 and served in various roles at the company for fifteen years. (*Id.*) During this time, she steadily ascended the ranks gaining greater responsibilities as she consistently exceeded her performance and revenue targets, managed sales and marketing teams, and managed the launch of marketing campaigns. (*Id.* ¶¶ 17–21.) Her employment record contains no documented performance concerns at any time over the course of the fifteen years. (*Id.* ¶ 58.) Lockwood compensated her under the "Lockwood Leadership Incentive Plan," which provided equity grants "in lieu of higher base salary and enhanced bonus opportunities," in order to reflect her importance to the company and to better align her incentives with the long-term success of the company. (*Id.* ¶¶ 23–25.)

Lockwood "employed fifteen or more employees" and was an "employer" within the meaning of the statutes at issue in the SAC. (*Id.* ¶ 14.) Lockwood is owned by Tourmalet, a Delaware-based holding partner controlled by Tourmalet GP LLC and affiliated with Ares Management LLC; Ares Management LLC allegedly exercises some level of control over

Lockwood's business development including when and how it may be sold. (*Id.* ¶¶ 10, 32, 103.) Schecter is the Founder and Chief Executive Officer of Lockwood and a direct supervisor to Di Benedetto during the period of the complaint. (*Id.* ¶ 11.) Banner is the President and Chief Operating Officer of Lockwood and was also a direct supervisor to Di Benedetto. (*Id.* ¶ 12.) Di Benedetto further alleges Schecter and Banner both "exercised day-to-day operational control over the company and personally participated in and directed the unlawful conduct alleged" in the SAC. (*Id.* ¶¶ 11–12.) Finally, West is the "Executive Vice President of People (Human Resources) of Lockwood," and was "responsible for human resources decisions." (*Id.* ¶13.) Di Benedetto alleges West was the employee who received her complaints about discrimination and illegal conduct and made the decision to terminate her employment in retaliation for the complaints. (*Id.*)

In 2022, however, Di Benedetto's relationship with Lockwood began to deteriorate when Lockwood hired Banner, and Di Benedetto began to report to Schecter as a co-lead of the company. (*Id.* ¶ 33.) Starting thereafter, women at Lockwood—and Di Benedetto in particular—began to suffer from "systematic gender discrimination." (*Id.* ¶ 35.) According to Di Benedetto, women were effectively frozen out of leadership positions. (*Id.*) For example, despite approximately 80% of the workforce being female, only two of twelve chief officers were women under the new management structure. (*Id.* ¶ 34.) Even at the executive level, male executives were provided with benefits and opportunities not afforded to their female counterparts such as the ability to go to board dinners, engage with clients, and gain access to professional development opportunities. (*Id.* ¶ 37.) Recommendations and issues brought by women were routinely dismissed until they were "repeated by male colleagues." (*Id.* ¶ 35.) Company business was routinely conducted through informal social events such as "golf outings" and "dinners" where female executives and employees were excluded. (*Id.* ¶ 36.)

In 2024, working conditions further deteriorated for Di Benedetto when she confronted Banner over a scheme to deprive Lockwood's employees of their bonuses. (*Id.* ¶¶ 39–41.) Di Benedetto realized Banner "was manipulating bonus calculation targets to avoid paying employees bonuses they had earned," and Lockwood was "misrepresenting its financial performance to the board of directors." (*Id.* ¶ 40–41.) Specifically, Di Benedetto alleges Banner employed one goal of $94 million, which the company was likely to meet, when reporting the financial situation to the board but employed another goal of $100 million when calculating whether the employees were eligible for an employment-based bonus. (*Id.*)

Following her complaints, Di Benedetto found herself the target of significant retaliation. (*Id.* ¶¶ 52–62.) Her role at Lockwood was "systematically dismantled," her marketing responsibilities were transferred to male executives, without being notified or consulted beforehand, she found her sales teams no longer reported to her, she was excluded from board meetings and other decision making processes. (*Id.* ¶ 53.) In May 2025, her sales team—the management of which was her primary responsibility at Lockwood—was made to report to a newly-hired male executive. (*Id.* ¶ 54.)

This retaliation extended into Lockwood's alleged lack of respect for Di Benedetto's need for paid time off in 2025. (*Id.* ¶ 47.) In 2025, Di Benedetto's father was diagnosed with a severe and life-threatening medical condition requiring immediate and ongoing treatment. (*Id.*) For that reason, Di Benedetto requested paid time off and informed Banner and West the time was being used to care for her severely ill father. (*Id.* ¶ 50.) Despite her request and the protected nature of her leave under the New Jersey Family Leave Act ("NJFLA"), N.J. Stat. Ann. 34:11B-1 *et seq.*, and Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, Lockwood—and Banner in particular—did not honor Di Benedetto's request for leave. (ECF No. 19 ¶ 49.) Banner required

Di Benedetto to work during her leave even when doing so would cause great hardship to Di Benedetto or her father. (*Id.* ¶ 51.) Di Benedetto provides an illustrative example of how this retaliation manifested: in April 2025, while she was on protected leave, she was required to take a call with a Lockwood client. (*Id.*) When she tried to reschedule or have another colleague fill in for her, Banner blocked her from doing so—ordering her to attend the call. (*Id.*) However, Banner did permit another of Di Benedetto's colleagues, who was slated to be on the call, to skip the call entirely. (*Id.*) Banner also joined the call, temporarily, only to reveal he was at a soccer game and proceeded to mute himself, requiring Di Benedetto to field the call solo while caring for her ailing father. (*Id.*)

In August 2025, the head of Human Resources, West, informed Di Benedetto the "writing is on the wall," and she should begin to seek new employment. (*Id.* at 45.) The fact Di Benedetto was going to be fired imminently was communicated approximately two months before she was formally terminated. (*Id.*) The termination itself took place on October 15, 2025; a year before her equity was slated to fully vest. (*Id.* ¶ 62.)

Since the termination, Di Benedetto alleges Lockwood has acted to unfairly restrict her ability to find other employment. (*Id.* ¶¶ 96–102.) Di Benedetto's contract contained a non-competition agreement (the "Restrictive Covenant"), which prevents her from working for "any business that provides medical communication services or any other similar services within the United States" for a year following the end of her employment with Lockwood. (*Id.* ¶ 96.) Despite the draconian language of the contract, Lockwood has never sought to enforce this provision "against any other former employee of Lockwood or Tourmalet." (*Id.* ¶ 97.) When Di Benedetto requested a list of companies she was restricted from working for, Lockwood refused to provide one. (*Id.*)

Finally, Di Benedetto alleges Lockwood is in the process of being sold by its current owner, Ares Management. (*Id.* ¶ 103) This event would have profound implications for Di Benedetto's rights under her incentive plan, which included an "Award Agreement" setting forth the terms of her equity in the company and her entitlement should the company be sold. (*Id.* ¶¶ 24, 106–07.) The Award Agreement contains a forfeiture provision and, as such, Di Benedetto will not be able to collect any additional equity following the sale of Lockwood. (*Id.* ¶ 107.)

### B. Procedural Background

On November 26, 2025, Di Benedetto filed her complaint in the Superior Court of New Jersey Law Division, Hudson County. *Di Benedetto v. The Lockwood Group, LLC*, HUD-L-4539-25 (November 26, 2025), Dkt. No. 1. She amended this complaint on December 1, 2025. (ECF No. 1-1 at 21.) On January 20, 2026, Defendants removed the case to the District Court of New Jersey, citing the diverse citizenship of the party. (ECF No. 1 ¶¶ 8–14.) On April 8, 2026, the Court held a Status Conference between the parties where Di Benedetto indicated she intended to amend her complaint. (ECF No. 16.) On April 10, 2026 the Court granted Di Benedetto's request to amend and updated the deadline for Defendants to file an answer or motion to dismiss. (ECF No. 18.)

On April 15, 2026, Di Benedetto filed the SAC. (ECF No. 19.) On May 23, 2026, Defendants filed the Motion to Dismiss. (ECF No. 20.) Di Benedetto filed her Opposition on May 22, 2026. (ECF No. 23.) Defendants filed their Reply on April 5, 2026. (ECF No. 25.)

## II. LEGAL STANDARD

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957); and then quoting Fed. R. Civ. P. 8(a)(2)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This "plausibility standard" requires the complaint to allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "[D]etailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a "recitation of the elements of a cause of action." *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). In assessing plausibility, the court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common

sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, conclusory or "bare-bones" allegations will no longer survive a motion to dismiss; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible, allowing "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Supreme Court's ruling in *Iqbal* emphasizes a plaintiff must show the allegations of his or her complaints are plausible. *See id.* at 670.

While, generally, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied* upon in the complaint . . . without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Princeton Univ.*, 30 F.4th at 342.

## III. Decision

Di Benedetto brings fourteen separate claims before the Court. (ECF No. 19 ¶¶ 109–79.) These claims are: (I) violation of the Conscientious Employee Protection Act ("CEPA"), N.J. Stat.

Ann. 34:19-1 *et seq.*; (II) Gender Discrimination in Violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. 10:5-1 *et seq.*; (III) Hostile Work Environment in Violation of the NJLAD; (IV) Retaliation in Violation of the NJLAD; (V) Violation of the New Jersey Family Leave Act ("NJFLA"), N.J. Stat. Ann. 34:11B-1 *et seq.*; (VI) Breach of the implied covenant of good faith and fair dealing; (VII) Unjust Enrichment; (VIII) Violation of New Jersey Wage Payment Law ("NJWPL"), N.J. Stat. Ann. 34:11-4.1 *et seq.*; (IX) Aiding and Abetting Violations of NJLAD; (XI) Violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*; (XII) a Request for Declaratory Judgment Regarding Unenforceability of Time-Vesting Unit Forfeiture and Entitlement to Full Vesting; (XIII) Request for Declaratory Judgment Regarding Di Benedetto's Rights in Performance Units and Entitlement to Participate in Liquidity Event; (XIV) Request for Declaratory Judgment that Lockwood's Restrictive Covenant is Unenforceable; (XV) Breach of Contract Regarding the Award Agreement.[2]

Defendants move to dismiss all claims, however, the Defendants present no challenge to Count XV, breach of contract. (*See generally* ECF No. 23.) That claim will therefore not be considered by the Court. The Court will address each other claim in turn.

**A. Di Benedetto has Alleged a Good Faith Belief in the illegality of Defendants' Conduct.**

Count I alleges Defendants violated the CEPA by retaliating against and ultimately firing Di Benedetto for reporting the company's allegedly illegal wage theft to the officers of the company. (ECF No. 19 ¶¶ 109–117.) Under the CEPA, if an employee "(1) reasonably believed that her employer's conduct was violating either a law, rule, or regulation promulgated pursuant

[2] The SAC presents fourteen separate counts labeled Count I to Count XV. However, there is no Count XI. The Court will refer the Counts by the numbers presented in the Complaint to avoid confusion.

to law, or a clear mandate of public policy; (2) performed a 'whistle-blowing' activity[;] . . . (3) an adverse employment action was taken against . . . her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action." *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003). Whistle-blowing activities include "[o]bject[ing] to, or refus[ing] to participate in any activity, policy or practice which the employee reasonably . . . (1) believes is in violation of a law[, rule, or regulation] . . . (2) is fraudulent or criminal; or . . . (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." N.J. Stat. Ann. 34:19–3(c). When a violation of the CEPA is alleged "the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law . . . identified by the court or the plaintiff." *Dzwonar*, 828 A.2d at 901.

Here, Di Benedetto alleges she objected to and attempted to discourage Banner from "dishonest practices" used to "avoid paying employees their earned compensation." (ECF No. 19 ¶¶ 26–27.) More specifically, Di Benedetto alleges there were two relevant metrics to determine how employee bonuses were to be paid out: (1) the "Net Agency Goal," which is the projection of year-over-year growth Lockwood presents to the board of directors based on past performance with some room for discretion in how it was calculated; and (2) the "Net Individual Goal," which is the amount an individual employee must bring in to be eligible for a bonus and is calculated as a strict percentage of the Net Agency Goal—in Di Benedetto's case 20%. (*Id.* ¶¶ 63–65.)[3] In Q1 2024, Banner set the Net Agency Goal to $100 million, mandating Di Benedetto's Net Individual

[3] Neither party has attached the actual agreements at issue and Di Benedetto does not include allegations for how the Net Agency Goal or specific Net Individual Goals are set. (See generally ECF Nos. 19, 21, 23.) The Court is therefore interpreting the contract based on Di Benedetto's allegations in the light most favorable to Di Benedetto. *Phillips*, 515 F.3d at 228.

Goal be set at $20 million. (*Id.* ¶ 64.) In the very next quarter, Banner secretly recalculated the Net Agency Goal, reducing it to $94 million for the purpose of reporting the lower projection to the board of directors. (*Id.* ¶ 65.) However, Banner "deliberately maintained the bonus calculations at the higher $100 million target . . . making it virtually impossible for employees to earn their bonuses." (*Id.* ¶ 66.) Di Benedetto further alleges Banner confessed "bonus targets were intentionally kept at $100 million . . . to avoid paying bonuses." (*Id.*)

Despite the specificity of the illegal conduct in the complaint, Di Benedetto offers multiple laws Defendants may have violated with little elaboration, alternatively suggesting the NJWPL, the Dodd-Frank Wall Street Reform and Consumer Protection Act 15 U.S.C. § 78u-6, uncited Connecticut pay transparency laws, and common law fraud. (*Id.* ¶¶ 29–32.) Defendants, because of this lack of specificity, argue the claims must be dismissed because each of these theories is fatally defective and therefore Di Benedetto could not have had a good faith belief in the illegality of the challenged conduct. (ECF No. 21 at 7–11.) In response to the allegation Defendants' conduct violated the NJWPL, Defendants point out the NJWPL excludes "any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto." N.J. Stat. Ann. 34:11-4.1. According to Defendants, because Banner's actions were allegedly aimed at depriving employees of a "supplementary incentive" and not their "base salary," it does not implicate the NJWPL. *See Mahanor v. Berkley Life Sciences*, Civ. A. No. 21-18981, 2022 WL 2541773 at *17 (D.N.J. July 7, 2022). Similarly, there is no indication Banner's representations to employees were fraudulent—the bonuses may have been higher, but if an employee managed to reach the required goal they would have been paid a bonus. "[E]ven a lay definition [of fraud] requires some sort of misrepresentation." *See Rotella v. Smithers PDS, LLC*, Civ. A. No. 20-3900, 2021 WL 12405898 at *5 (D.N.J. Oct. 26, 2021).

The Court agrees the SAC fails to allege a violation of the Dodd-Frank Act. Even assuming this representation directly made it into investor disclosures—there is no indication Banner's more conservative representation of Lockwood's likely growth was incorrect or misleading, on the contrary Di Benedetto complains that meeting the bonus requirements was "virtually impossible," presumably because the more conservative estimate was more accurate. (ECF No. 19 ¶ 65.)

Di Benedetto appears to concede all these points, and her opposition simply states "CEPA requires only a reasonable belief that the complained-of conduct violated a law." (ECF No. 23 at 2.) Di Benedetto is correct, CEPA does not "make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful." *Hitesman v. Bridgeway, Inc.*, 93 A.3d 306, 318 (N.J. 2014) (quoting *Dzwonar*, 828 A.2d at 900). "[I]t is not the plaintiff's burden to show that the defendant actually violated the law . . . but only to demonstrate that he or she held a reasonable belief that such a violation occurred." *Id.* However, there cannot be a substantial nexus between Defendants' conduct a "clear mandate of public policy," where the allegedly wrongful conduct is lawful. *Dzwonar*, 828 A.2d at 900.

Despite Di Benedetto's scattershot approach in alleging what laws she seemingly believed Defendants violated, and her apparent lack of faith in her own legal theories, the conduct Di Benedetto describes is wage theft within the meaning of the NJWPL. (ECF No. 19 ¶¶ 24–25.) And although Di Benedetto and Lockwood label her compensation under the Award Agreement and the Lockwood Leadership Incentive Program a "bonus" or as "incentive compensation" respectively (*id.* ¶¶ 83, 108), whether they are protected by the NJWPL does not turn on how the parties choose to label the payments, but on what the payment was structured to compensate. *See generally Musker v. Suuchi, Inc.* 331 A.3d 900 (N.J. 2025). Where payment "directly compensates

an employee for performing a service[,] it always meets the definition of wages under [the NJWPL].” *Id.* at 906. To be a true supplementary incentive, a bonus must be “calculated independently of regular wages and paid in addition thereto.” N.J. Stat. Ann. 34:11-4.1(c). In other words, a “supplementary incentive” must incentivize “something that is beyond the employee’s ‘labor or services.’” The Supreme Court of New Jersey provided illustrative examples of supplementary incentives such as paying employees “for sharing office space with another employee, working out of a particular office location, achieving perfect attendance, referring a friend to apply for an open position, or participating in an office costume contest.” *Musker*, 331 A.3d at 906. Each of these examples demonstrates that to be a supplementary incentive, compensation must encourage actions distinct from the labor itself. It could not be otherwise; if the law functioned as Defendants claim, employees would be essentially unprotected by the statute any time their employer decided to label the bulk of compensation for their core job responsibilities a “bonus” or “incentive” rather than wage or salary. *Id.*

The Supreme Court of New Jersey’s examples clearly show to be outside the scope of the NJWPL the compensation cannot relate to core job duties of the employee. *Id.* Here the SAC is clear the bonuses were compensation for her performance of her job duties and were provided “in lieu of higher base salary.” (ECF No. 19 ¶ 25.) Although Defendants argue this compensation is a bonus because it was provided alongside a base salary, the Supreme Court of New Jersey rejected this precise reasoning. *Musker*, 331 A.3d at 908. When presented with this argument, the Supreme Court of New Jersey “disagree[d] with the notion that receiving a base salary turns ‘commissions’ into ‘supplementary incentives’ under the [NJWPL].” *Id.*

Even were the Court to hold Di Benedetto’s allegations do not fall within the meaning of wage under the NJWPL, this conduct would still be unlawful under the New Jersey Wage

Collection Law as amended by the Wage Theft Act (the "Wage Theft Acts"). *See* N.J. Stat. Ann. 34:11-57 *et seq*. Unlike the NJWPL, "wages" under the Wage Theft Acts includes "commissions, bonus, piecework compensation and any other benefits arising out of an employment contract." *See* N.J. Stat. Ann. 34:11-57. However, the Wage Theft Acts do not provide a private cause of action for individuals harmed by improper denial of wages. *Mahanor*, 2022 WL 2541773, *18 (holding the Wage Theft Acts "do[] not confer a private right of action for individual litigants). Instead, the Wage Theft Acts create an "administrative process through which employees may recover wages in wage disputes," by complaining to the New Jersey Department of Labor. *Id.* However, CEPA protects Di Benedetto's decision to report any violation of "law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy" by Lockwood, not merely those which the Defendants might be individually sued for. N.J. Stat. Ann. 34:19-3c.[4]

Defendants also argue there is no "causal connection," alleged between Di Benedetto whistle-blowing activity and the adverse action of firing her. (ECF No. 21 at 10.) They suggest "at least 10 months elapsed between her supposed CEPA complaints in February 2024 and the alleged escalating retaliatory conduct beginning in 2025." (*Id.* at 11.) This is a straightforward mischaracterization of Di Benedetto's allegations, although Di Benedetto alleges she was subjected to "escalating retaliatory conduct" throughout 2025, she does not claim the retaliatory conduct only began in 2025, and instead alleges her working conditions "deteriorated

[4] The Court must also clarify the scope of its holding here. It is not illegitimate or wage theft to set bonus goals which are higher than the company internally believes is likely. What is at issue here is the precise structure of how Di Benedetto alleges bonus goals are set and communicated to employees. (*See* ECF No. 19 ¶¶ 63–66.) She alleges bonus goals are non-discretionarily pegged to a percentage of a company's internal growth goals, and that Lockwood (through Banner) maintained separate books with different versions of the same growth metric for the purpose of avoiding paying employee's earned bonuses. (*Id.*) At this stage these allegations are sufficient to maintain a claim under the NJWPL.

dramatically" following her initial complaints and escalated in 2025 after she confronted the senior management again. (ECF No. 19 ¶¶ 42–43, 52–53.)

For these foregoing reasons, the Court will not dismiss Count I. Because the bonuses Di Benedetto was denied qualify as wages under the NJWPL, *see Musker* 331 A.3d at 906, Count VIII for violation of the NJWPL will likewise not be dismissed.

### B. Di Benedetto states a claim for discriminatory treatment under the NJLAD, but not discriminatory termination.

Di Benedetto alleges gender discrimination under the NJLAD. First, disparate treatment while employed by Lockwood, and second discriminatory termination. (ECF No. 19 ¶¶ 33–37, 53–55.) Defendants challenge the sufficiency of each of these discrimination theories, arguing defendant has failed to allege Lockwood sought an employee with similar qualifications to Di Benedetto after she was terminated and because she has failed to allege disparate treatment of sufficient severity. (ECF No. 21 at 12.) To state a *prima facie* NJLAD discriminatory termination claim, Plaintiff must allege: "(1) that [she] is in a protected class; (2) that [she] was otherwise qualified and performing the essential functions of the job; (3) that [she] was terminated; and (4) that [Lockwood] thereafter sought similarly qualified individuals for [her] job." *Victor v. State*, 4 A.3d 126, 141 (N. J. 2010). The burden to proceed with any discrimination claim under the NJLAD is "rather modest." *Id.* Despite this modest burden, the Court finds Di Benedetto has failed to plead wrongful termination because she fails to allege Lockwood sought employees of similar or lesser qualification to fill her role. (*See* ECF No. 19 ¶¶ 61–62.) Di Benedetto argues she is "not required to identify every comparator by name." (*Id.*) Although this may be true, this does not alleviate her of the need to allege facts which relate to all elements of her claim.

As to claims of disparate treatment under the NJLAD, a plaintiff must prove the following elements: "(1) . . . she is a member of a class protected by the NJLAD; (2) . . . she was qualified for a benefit offered by the defendant; (3) defendant denied plaintiff the benefit sought; and (4) others, who are not members of the same protected class, with the same qualifications received the benefit sought. *See Kravits v. Royal Oak Apartments, LLC*, No. A-1686-20, 2022 WL 244115 at *4 (N.J. Super. Ct. App. Div. Jan. 27, 2022) (citing *Victor*, 4 A.3d at 141). The disparate treatment must be "must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Medley v. Atlantic Exposition Srvs., Inc.*, 550 F. Supp. 170, 198 (D.N.J. 2021). Defendants argue Di Benedetto fails to allege disparate treatment of this severity. (ECF No. 21 at 13.)

The Court disagrees. Di Benedetto alleges Lockwood provided male employees opportunities for advancement, client contact, and interaction with the board of directors which were systematically denied to female employees. (ECF No. 19 ¶¶ 33–37, 53–55.) Further, she contends her responsibilities as a senior executive were stripped away to the benefit of male coworkers imminently less experienced or qualified. (*Id.*) The Court cannot conclude from these allegations gender discrimination was not sufficiently serious so as to alter the terms of Di Benedetto's employment.

For these foregoing reasons, Count II, Gender Discrimination in Violation of the NJLAD will be dismissed in part. To the degree this Count is based on wrongful termination, it is dismissed without prejudice. To the degree it is based on disparate treatment within her role, it will be permitted to proceed.

**C. A claim for hostile work environment must allege more than a preference for non-protected colleagues.**

To plead a *prima facie* NJLAD hostile work environment claim, Plaintiff must allege "(1) [she] is in a protected class; (2) [she] was subjected to conduct that would not have occurred but for that protected status; and (3) that it was severe or pervasive enough to alter the conditions of employment." *Victor*, 203 N.J. at 409; *Lopez v. Lopez*, 997 F. Supp. 2d 256, 274 (D.N.J. 2014). Defendants argue Di Benedetto has failed to show the actions of Lockwood or the other defendants were "severe or pervasive enough" to qualify as a hostile work environment. (ECF No. 21 at 14.)

The Court agrees. Although the SAC does allege a concerning pattern of preference for male employees, such as a "boy's club culture," executive events where women were excluded, and preferential treatment of the ideas proposed by male colleagues (ECF No. 19 ¶¶ 35–36), the "*sine qua non* of a hostile work environment claim is a workplace permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to . . . create an abusive working environment," *Nuness v. Simon and Schuster, Inc.*, 221 F. Supp. 3d 596, 601 (D.N.J. 2016) (internal quotation marks omitted). There are no allegations of such ridicule, harassment, or insult to sustain a hostile work environment claim. (*See generally* ECF No. 19.) Therefore, Count IV is dismissed without prejudice.

**D. The alleged conduct of Lockwood and its senior executives qualifies as retaliation under the NJLAD**

Retaliation under the NJLAD requires Di Benedetto to show "(1) [she] was in a protected class; (2) [she] engaged in protected activity known to [Defendants]; (3) [she] was thereafter subjected to an adverse employment action; and (4) that there is a causal link between the protected activity and the adverse employment consequence." *Victor*, 4 A.3d at 141. "[A] person engages in a 'protected activity' under the NJLAD when that person opposes any practice rendered unlawful under the NJLAD." *Cohen v. BH Media Grp., Inc.*, 419 F. Supp. 3d 831, 861 (D.N.J. 2019). "An

adverse action must be 'materially adverse, such that it is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Registre v. Trane Technologies PLC*, Civ. A. No. 25-11990, 2026 WL 905452 at *6 (D.N.J. Apr. 2, 2026) (quoting *Smith v. City of Atl. City*, 138 F.4th 759, 775 (2d Cir. 2025)).

Defendants argue Di Benedetto does not show they knew of her complaints when they chose to retaliate against her; specifically, they argue there is no allegation West or Schecter knew of her complaints or of claims of gender discrimination. (ECF No. 21 at 15.) Defendants cite *Barroso v. Lidestri Foods, Inc.*, for the proposition that without knowledge of harassment, a defendant cannot be liable for retaliation. 937 F. Supp. 2d 620, 637 (D.N.J. 2013). But *Barroso* is distinguishable because it was a case at summary judgment where the plaintiff made a confidential complaint about another employee's sexual harassment that the employee had no way of knowing about. *Id.* The Court only addresses Di Benedetto allegations, and she alleges she made her complaints directly to the entirety of "senior management" without anonymity. (ECF No. 19 ¶ 43.) She also alleges confronting Banner, a primary retaliator, directly about his discriminatory conduct toward female employees. (*Id.* ¶ 39.) There is no question Di Benedetto alleges Defendants had knowledge of her protected activity.

Second, Defendants contend Di Benedetto's retaliation claim must be dismissed because there is an insufficient temporal nexus between her complaints in January 2025, and the retaliation alleged to occur "throughout 2025." (ECF No. 21 at 15.) "A plaintiff may demonstrate causation by showing: (1) a close temporal relationship between her report and discharge, or (2) that 'the proffered evidence, looked at as a whole raises the inference of causation.'" *Nuness*, 221 F. Supp. 3d at 606 (quoting *LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n*, 504 F.3d 217, 232 (3d Cir. 2007)). Defendants conflate the fact Di Benedetto first complained of gender discrimination in

2024 with the idea this complaint was the only time she complained, however, this is not the case. (ECF No. 21 at 15.) The SAC alleges Di Benedetto complained both in 2024 and 2025, with retaliation occurring both years, but with "escalating retaliatory conduct, which ultimately culminated in her termination" in 2025. (ECF No. 19 ¶¶ 43, 52.) Moreover, the conduct Di Benedetto alleges is that of a culture of retaliation responding to a number of different protected activities. (*Id.* ¶¶ 17–46.) A causal link between her protected actions and the retaliation against her may be inferred absent a one-to-one link between action and response. *Nuness*, 221 F. Supp. 3d at 606.

For the foregoing reasons the Court will not dismiss Count IV for retaliation in violation of the NJLAD.

### E. Because Di Benedetto's NJLAD claims survive, her claim against the Individual Defendants for Aiding and Abetting those violations likewise survive.

Defendants point out claims for aiding and abetting under the NJLAD, *i.e.*, Count IX, violations rise and fall with the underlying claims for the violations themselves. (ECF No. 21 at 22.) Defendants believe all claims under the NJLAD should be dismissed, and therefore the aiding and abetting claim must likewise be dismissed. (*Id.*) Defendants are correct insofar as a claim for aiding and abetting an NJLAD violation "necessarily fails" if the NJLAD violation itself has been dismissed. *K.J. v. J.P.D.*, 659 F. Supp. 3d 471, 477 (D.N.J. 2023). However, because Di Benedetto's claims for discriminatory treatment and retaliation survive, so to does this claim. *See supra*. Section III.C, E.

### F. Di Benedetto properly alleges violations of both NJFLA and FMLA.

Claims V and X allege violations of the NJFLA and FMLA respectively. (ECF No. 19 ¶¶ 134–37, 157–61.) Although the NJFLA and FMLA are different statutes "[d]ue to the similarity

of the statutes, courts apply the same standards and framework to claims under the FMLA and the NJFLA." *Wolpert v. Abbott Laboratories*, 817 F. Supp. 2d 424, 437 (D.N.J. 2011). Under these statutes, Di Benedetto "must show: (1) [s]he was entitled to take FMLA and NJFLA leave and (2) [Defendants] denied h[er] right to do so." *Zhuang v. EMD Performance Materials Corp.*, Civ. A. No. 18-1432, 2018 WL 3814282 at *7 (D.N.J. Aug. 10, 2018) (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 312 (3d Cir. 2012)). Defendants argue Di Benedetto failed to state a claim for violations of either the NJFLA or the FMLA because none of her requests for leave were formally denied. (ECF No. 21 at 17–18.)

This interpretation is at odds with the well-established meaning of the statutes. It is not sufficient for Defendants to officially approve of family medical leave—they must respect Di Benedetto's right to medical leave by not requiring her to work during the period of approved leave. 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with [leave protected under this subchapter].") The SAC demonstrates that Lockwood, and Banner in particular, demanded she perform active work duties by taking client calls and contributing to work projects while on leave. (ECF No. 19 ¶¶ 50–51.) Interference with leave under these acts is "not [limited to] refusing to authorize FMLA leave," but includes interfering with the rights the act guarantees. *Sommer v. The Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006); *see also Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 251 (3d Cir. 2014) (holding interfering with FLMA rights is actionable under the statute).

For the foregoing reasons, the Court will not dismiss Counts V and X.

**G. The implied covenant of good faith and fair dealing is violated by pretextual firing that to denies Di Benedetto bargained-for benefits, however there is present no case or controversy to justify related prospective Declaratory Judgment.**

Defendants move to dismiss Count VI of Di Benedetto's complaint alleging a breach of the implied covenant of good faith and fair dealing, arguing Di Benedetto failed to "allege the existence of an employment contract" or that she was denied a benefit she was entitled to under such Contract. (ECF No. 21 at 20.) Di Benedetto responds she has clearly alleged such a contract exists—the Award Agreement, which entitled her to equity in Lockwood set to vest a year after she was terminated. (ECF No. 23 at 5.) Di Benedetto clearly alleges the Award Agreement between herself and Lockwood is the contract at issue (ECF No. 19 ¶ 139)—and outside of citing *Anderson v. DSM N.V.*, for the proposition that a "claim for breach of the implied covenant of good faith and fair dealing is dependent on the existence of a valid employment contract," it is unclear what further allegations regarding the existence of a contract Defendants would have the Court require. (ECF No. 21 at 20 (citing 589 F. Supp. 2d 528, 534 (D.N.J. 2011)).) To the extent Defendants argue Count VI is premised on the potential future sale of Lockwood and is therefore the deprivation is too speculative to sustain a cause of action (ECF No. 25 at 12 (citing *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014)), this argument conflates Counts VI and Count XIII, where Di Benedetto requests Declaratory Judgment that she is entitled to participate and benefit from the sale—should one occur. (ECF No. 19 ¶ 166–69.) The SAC is explicit the harm from her termination has already occurred "[a]ll Performance Units were automatically forfeited upon Plaintiff's termination under Section 2(b) of the Award Agreement." (*Id.* ¶ 90.)

Defendants' briefing shows their real objection to this claim is that nothing within Di Benedetto's Award Agreement protected her from without-cause termination. (ECF No. 21 at 20–21.) Although "[a] covenant of good faith and fair dealing is implied [by law] into every contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 395 (2005) (internal quotation marks omitted). Despite the implied covenant of good faith and fair dealing

being part of employment contracts as well, the covenant does not "restrict the authority of employers to fire at-will employees." *House v. Carter-Wallace, Inc.*, 556 A.2d 353, 360 (N.J. Super. Ct. App. Div. 1989) (quoting *Citizens State Bank of New Jersey v. Libertelli*, 521 A.2d 867, 869 (N.J. Super. Ct. App. Div. 1987)). The Award Agreement contains no provision restricting Lockwood's right to terminate, nor assuring Di Benedetto that Lockwood would not exercise its authority to terminate. (ECF No. 21 at 20.) And a claim of breach of the implied covenant of good faith and fair dealing only "requires the parties refrain from conduct, which will have the effect of destroying or injuring the right of the other party to receive *the benefits of the contract*." *Comprehensive Neurosurgical, P.C. v. Valley Hosp.*, 312 A.3d 243, 262 (N.J. 2024) (internal quotation marks omitted). Therefore, under Defendants' theory, since there was no restriction on the authority to fire and equity vesting was contingent upon Di Benedetto's continued employment, she has not actually suffered a loss. (ECF No. 21 at 20.)

Defendants are correct that Lockwood had the authority to fire Di Benedetto, but this is not dispositive. "[A] party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations even when it exercises an express and unconditional right to terminate." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001) (quoting *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 588 (N.J. 1997)). "[T]ermination motivated by bad faith or malice is not in the public interest and constitutes a breach of the employment contract." *Pierce v. Ortho Pharm. Corp.*, 417 A.2d 505, 510 (1980) (citing *Fortune v. National Cash Register Co.*, 364 N.E.2d 1251 (Mass. 1977) (noting that an employment contract, even at will, includes an implied covenant of good faith; employee has a cause of action when employer dismissed him to avoid paying a bonus)). "Proof of bad motive or intention is vital to an action for breach of the covenant." *Brunswick Hills Racquet Club*, 864 A.2d at 396.

However, Di Benedetto is clear her firing was "pretextual" and was actually retaliation for her attempts to end Lockwood's illegal wage-theft. (ECF No. 19 ¶ 58.) This retaliation extends to strategically timing her termination to prevent her from being able to collect the equity she was entitled to under the contract as well as "year-end bonus payments and before any equity liquidity event." (*Id.* ¶ 61.) That is sufficient to state a claim for breach of the implied covenant at this stage.

However, as to Counts XII and XIII for Declaratory Judgment, the Court interprets Defendants' objections to the speculative nature of claims based on a potential future liquidity event as moving to dismiss this claim. (ECF No. 21 at 21.) Here, it is a fundamental constitutional requirement that the Court only address "actual cases or controversies" harm which rest on a "speculative chain of possibilities does not establish that injury . . . is certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 (2013). Here, Plaintiff is similarly clear "[n]o qualifying liquidity event has yet occurred," nor is an attempted sale ongoing, she merely alleges "Ares Management plans to bring The Lockwood Group to market in 2026" and were this to happen it would deprive her of a substantial opportunity to cash out her shares. (ECF No 19 ¶¶ 90, 106.) This is the precise "chain of possibilities" that SCOTUS has rejected. *See Clapper*. 568 U.S. at 415. Counts XII and XIII must therefore be dismissed without prejudice, Count VI will not be dismissed and may proceed as pled.

**H. Unjust Enrichment is Improperly Duplicative of Di Benedetto's contract claims and is therefore dismissed.**

Di Benedetto also alleges Defendants have been unjustly enriched by their decision to terminate her employment nine months into the year when she had completed 82.5% of her performance for the year and refusal to pay the bonus she was likely to earn or permit her to benefit from the unvested equity. (ECF No. 19 ¶¶ 141–48.) Although not specified in the SAC, Di

Benedetto makes clear in her opposition this claim is pled in the alternative. (ECF No. 23 at 6.) "To demonstrate unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust and that the plaintiff expected remuneration and the failure to give remuneration unjustly enriched the defendant." *EnviroFinance Grp., LLC v. Env't Barrier Co., LLC*, 113 A.3d 775, 790 (N.J. Super. Ct. App. Div. 2015).

Defendants take issue with the fact Defendant had only completed 82.5% of her performance goal and therefore she "had *not* achieved that goal as of her termination," and request the claim be dismissed. (ECF No. 21 at 21–22.)

Without addressing Defendant's objection, the Court will dismiss this claim as duplicative of Di Benedetto's contract claims. "Recovery for unjust enrichment cannot exist when there is an enforceable agreement among parties." *Gujja v. Inpatient Servs. of New Jersey, P.C.*, Civ. A. No. 21-19416, 2022 WL 2834998, at *2 (D.N.J. July 20, 2022). Although a plaintiff "may plead claims in the alternative under Rule 8(d) . . . courts in this District regularly dismiss unjust enrichment claims that are duplicative of a complaint's breach of contract claims." *Id.* at *2–3. "By its very nature, the implied covenant of good faith and fair dealing sounds in contract." *Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 463 (D.N.J. 2020). Therefore, "absent a claim that the Agreement is invalid or that [Di Benedetto] performed work beyond that covered by the Agreement," the Court "cannot sustain claims founded on quasi-contractual theories," duplicative of contract theories. *Freightmaster USA, LLC v. Fedex, Inc.*, Civ. A. No. 14-3229, 2015 WL 1472665, *6 (D.N.J. Mar. 31, 2015).

Count VII, for Unjust Enrichment must therefore be dismissed without prejudice.

**I. There is no present case or controversy for the Court to issue a Declaratory Judgment on the enforceability of the Restrictive Covenant.**

Alongside its other allegations, Count XIV of the SAC alleges Di Benedetto is currently bound by a non-competition agreement of extraordinary scope which prevents her from working for any company that engages in medical communication services or "any other similar services within the United States" for an entire year after her termination. (ECF No. 19 ¶ 96.) This restriction renders Di Benedetto "unable to accept employment in the only industry she has practiced for 26 years." (*Id.*) However, although Di Benedetto is clear she sought and eventually received clarification regarding a list of company she was prohibited from working for she does not allege she had taken concrete steps to pursue a position with any of these companies or any other competitor. (*Id.* ¶¶ 96–102.)

Ripeness in declaratory judgment actions turns on three factors: "(1) the parties must have adverse legal interests; (2) the facts must be sufficiently concrete to allow for a conclusive legal judgment; and (3) the judgment must be useful to the parties." *Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006) (citing *Step-Saver*, 912 F.2d at 647).

Defendants argue the failure to show any such steps or specific intention to seek such employment is fatal to this claim because it is not sufficiently concrete to implicate this Court's jurisdiction. (ECF No. 21 at 23.) According to Defendants, Di Benedetto's claim is premised on "a potential harm that is 'contingent' on a future event occurring" and therefore "will likely not satisfy [the first prong] of the ripeness test." *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Loc. Union No. 66*, 580 F.3d 185, 190 (3d Cir. 2009). The Court agrees. Even in her opposition, Di Benedetto only suggests the "covenant has chilled and delayed employment opportunities," not that she has any specific intent to violate the covenant or that Lockwood have

taken actions suggesting they intend to enforce the contract. (ECF No. 23 at 6.) Therefore, there is no case or controversy for the Court to decide at this time. Count XIV is dismissed without prejudice.

Because this Count would be dismissed under any applicable law, the Court declines to determine whether this claim should be considered under New Jersey or Delaware Law. (ECF No. 21 at 24.)

## IV. CONCLUSION

For the foregoing reasons Defendants' Motion to Dismiss the Second Amended Complaint is **GRANTED IN PART** Counts III, VII, XII, XIII, and XIV are **DISMISSED WITHOUT PREJUDICE**. All other claims may proceed. An accompanying order follows.

**Date: September 4th, 2026**

***/s/ Brian R. Martinotti***
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**